### NEW YORK CANAL CO., Limited, v. UNITED STATES.

(District Court, D. Idaho, S. D. December 31, 1913.)

Waters and water courses ⟸222—Contract between Government and irrigation company construed.

A contract between the United States and an irrigation company by which the latter turned over its canal to become part of a larger government project, which was to include storage reservoirs for the flood waters of the river, but "reserving" to its stockholders and contract holders a designated quantity of water which the company claimed the right to appropriate from the river, and which the government agreed to carry and distribute, "provided that delivery * * * shall be made exclusively from the unregulated flow of the Boise river and shall be limited by the amount thereof," held to require the government to deliver thereunder only so much water as the company was actually entitled to take from the river under its appropriation, though, as later to be determined in a then pending suit, the quantity might be less than that named in the contract.

At Law. Action by the New York Canal Company, Limited, against the United States. Judgment for defendant.

Cavanah, Blake & MacLane, of Boise, Idaho, for plaintiff.

C. H. Lingenfelter and B. E. Stoutemyer, both of Boise, Idaho, for the United States.

⟸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DIETRICH, District Judge. This suit is brought by the New York Canal Company against the United States to recover $500 as damages for the alleged breach of a written contract, dated March 3, 1906, a copy of which is attached to the complaint. Jurisdiction rests upon section 24, subd. 20, of the Judicial Code (Comp. St. § 991, subd. 20). The controversy primarily involves the construction of the contract, and grows out of the administration of what is commonly known as the Reclamation Act (32 Stat. 388 [Comp. St. §§ 4700–4708]), by which certain of the proceeds arising from the sale of public lands are appropriated for the reclamation of arid lands.

It appears that prior to the execution of the contract the plaintiff company was the owner of a canal diverting water from the Boise river, upon the left bank thereof, a short distance above the city of Boise, by means of which it was distributing to its stockholders and to others possessing rights under permanent contracts water for the irrigation of their farms. In the same vicinity there were large bodies of arid public lands, and these the Secretary of the interior, in the exercise of the discretion and authority vested in him by the Reclamation Act, decided to reclaim; and accordingly they were withdrawn from entry, and the project came to be known as the Payette-Boise project.

Upon investigation it was found that the right of way occupied by the plaintiff's main canal was highly desirable for the government project, and negotiations were opened for taking over the system for such use. It is also shown that the plaintiff had no permanent diversion dam in the river, and that, on account of the difficulties in keeping in repair the upper portion of the canal, the cost of its maintenance was great, and the delivery of water was at times either wholly interrupted or insufficient in quantity. It further appears that while negotiations leading to the execution of the contract were in progress, and at the time the terms and form thereof were finally agreed upon by the plaintiff's board of directors and stockholders, a suit was pending in the district court of the Seventh judicial district of Idaho in and for Canyon county, wherein the Farmers' Co-operative Ditch Company was plaintiff, and the Riverside Irrigation District and others, including the plaintiff here, were defendants, for the settlement and adjudication of the rights of most of the claimants of water in the Boise river. Decree was rendered therein upon January 18, 1906, but thereafter an appeal was taken to the Supreme Court of the state, resulting in an affirmance in so far as the decree established the dates of the several appropriations, but in a reversal as to the duty of water, and hence as to the amount of each appropriation, with instructions that this issue be retried by the court below. At this time and subsequently the government claimed, as an original appropriator, the right to divert from the Boise river water to the amount of 1,647 second feet, dating from December 4, 1903. This right, it was known, would be available generally only during the early spring; it being the purpose of the government to supplement the natural supply during the summer season by the creation of storage reservoirs for the conservation of the flood waters.

Now turning to the contract itself: It refers to the adoption of the project by the Secretary of the Interior; recites that the line of the plaintiff's canal is the most advantageous location for the canal proposed to be constructed by the government; also that the plaintiff "is unable to deliver all the water to which the holders of its certificates of stock and of its water right contracts are entitled," and that, "by reason of the improved facilities furnished by the construction proposed by the United States Reclamation Service, the entire water supply for holders of said certificates and contracts can be delivered more uniformly and at less cost." Thereupon it is stated that the plaintiff "grants to the United States the right to occupy, use, and control perpetually and exclusively the right of way" of the plaintiff's main canal, "together with the right to enlarge the said canal and to construct, operate, and maintain upon said right of way such canal, structures, and other works or appurtenances as may be necessary or convenient," and there is also a grant and transfer to the United States of all the plaintiff's right, title, and interest in and to its water rights and power rights and privileges, all free from any obligations, charges, terms, or conditions at any time assumed by it, except as specifically provided for. Thereupon follow paragraphs from 4 to 8, inclusive, which literally are:

"(4) It is agreed that there shall be reserved to the holders of certificates of stock for not more than fifteen thousand shares, an amount of water equivalent to four-fifths of an inch for each share, not exceeding in total twelve thousand inches, or two hundred and forty cubic feet of water per second of time.

"(5) It is further agreed that there shall be reserved to the owners thereof certain water rights represented by contracts heretofore made by the party of the first part, the amount of eighteen hundred ninety-three (1,893) inches of water, or thirty-seven and eighty-six hundredths (37.86) cubic feet per second of time.

"(6) The said total of thirteen thousand eight hundred ninety-three (13,893) inches of water being 277.86 cubic feet per second of time, the vested water right claimed by the company and its stockholders shall be regarded as of the priority determined by the courts.

"(7) The delivery of such water reserved to the holders of said certificates of stock and contracts, and the payments for maintaining and operating the system as hereinafter provided, shall be made in accordance with the provisions of the existing by-laws of the said company and the terms of the contracts, from any existing lateral on the main canal between the point of diversion at Boise river and a point not more than five miles southwest of the crossing of such main canal by the Oregon Short Line Railroad near Mora, and shall be given precedence over any other rights to water in said canal which may be subsequently acquired, provided that delivery of water represented by said certificates of stock and contracts shall be made exclusively from the unregulated flow of the Boise river and shall be limited by the amount thereof. Copies of the said by-laws and contracts are hereto attached and made a part hereof. And provided further that it is expressly agreed and understood that no part of the expense for the enlargement of said canal shall be assessed against or borne by or charged to the stock of the stockholders of the said New York Canal Company, Limited.

"(8) It is further agreed that an equitable proportion of the cost of maintaining and operating the system of irrigation works which may be constructed by the United States on the south side of the Boise Valley, as may be determined by the Secretary of the Interior, shall be paid to the United States by the holders of said certificates of stock. The holders of rights under said contracts with the company shall pay to the United States the cost

of maintaining and operating such system of irrigation works in accordance with the terms of their said contract."

It will be noted that it was agreed that there should be "reserved" for the use of the holders of plaintiff's certificates of stock an amount of water "equivalent to four-fifths of an inch for each share," for not to exceed 1,500 shares, or 240 second feet, and for the contract holders the additional amount of 37.86 second feet, or a total of 277.86 second feet. By the decree in the water suit in the state court, however, plaintiff was awarded as the full measure of the rights it possessed when the contract was entered into, and as of date March 23, 1900, only 219.1 second feet, a much smaller amount than it had claimed. And in the amount of this award lies the source of the controversy, the plaintiff asserting that under the contract it is entitled to receive the full amount of $277.86 second feet of water, while the defendant contends that its obligation in this respect does not extend beyond the rights of the plaintiff as an appropriator, namely, 219.1 feet.

It is set forth in the complaint and admitted in the answer that the aggregate of all rights, including that of the plaintiff, awarded by the original decree in the water suit, of dates prior to the government appropriation, is 2,698.5 second feet, and that three rights, aggregating 85.5 feet, intervene between the plaintiff's appropriation and that of the government. It is further averred that during the season of 1912, while there was flowing in the river more than enough water to supply all rights prior to the defendant's appropriation, it declined to deliver, for the use of the plaintiff's stockholders or contract holders, any amount in excess of 219.1 second feet. Does, then, the plaintiff's appropriation constitute the maximum measure of the defendant's obligation, or, for the purpose of supplying the full amount of 277.86 second feet, must it draw upon its own appropriation?

If it be assumed that the present contingency was anticipated by the parties, and that both considered that the plaintiff's water right might be held to be less than 277.86 feet, it is impossible to adopt either view without greatly straining some of the language of the contract. Words may be selected by the plaintiff, which, when isolated, tend strongly to support its contention; and in like manner the defendant may fortify its position. Indeed, upon such an assumption the phraseology is in some respects not only inapt, but incongruous, and upon the whole the conclusion seems unavoidable that the agreement was made upon the understanding by both parties that the defendant's appropriation exceeded the 277.86 feet. Against this view is the simple fact that the decree in the state district court was entered before the contract was signed, but admittedly at a time long prior to the rendition of the decree the plaintiff's board of directors had agreed with the defendant not only upon the terms and conditions, but upon the very form of the contract, and their action had, as early as October 11, 1905, been ratified by the stockholders. No decree had then been rendered, and the plaintiff was claiming a right greatly in excess of 277.86 feet. Moreover, at the time the contract was actually signed the decree was not final, for the suit was in course of appeal to the Supreme Court. If, as is not improbable, the plaintiff was, at the time the instrument

was drafted and its form agreed upon, confidently asserting a much larger right, it might not have occurred to any one to provide for the present contingency; nor would the rendition of the decree necessarily have suggested to any of the agents of the government the desirability of making express provision in the draft which had long been fully agreed upon, and the conditions of which had long been regarded as definitely settled, especially when such decree was not regarded as final.

If now we assume that at the time the form of the contract was agreed upon neither party anticipated an award to the plaintiff of less than 277.86 feet, we have no serious difficulty in harmonizing the phraseology of the entire instrument, and there is left little room for doubt as to its true intent and meaning. Upon such assumption, it becomes unnecessary to put a strain upon the word "reserved" as the same is used in paragraphs 4 and 5, or to argue that it was employed in the exceptional and unusual sense of conveying to or vesting in the plaintiff, as grantor, a title or right greater or other than that of which it was already possessed. In the sixth paragraph the clause which refers to the 277.86 second feet as "the vested water right claimed by the (plaintiff) company and its stockholders" may be given its natural significance; and so with the further clause in the same paragraph, "shall be regarded as of the priority (that is, of the date in relation to other rights) determined by the courts." In paragraph 7 the proviso to the effect that the water for the use of the plaintiff and its stockholders should be delivered "exclusively from the unregulated flow of the Boise river," and should be limited by the amount thereof, loses the significance which the plaintiff attaches to it. It may be assumed that "unregulated flow" means the natural flow of the river, as distinguished from the water which the defendant planned to conserve in reservoirs and release from time to time for use during the low-water season. Applying the maxim, "Expressio unius exclusio alterius," the plaintiff has argued, why, if the government understood that its obligation to furnish water under the contract was restricted to the plaintiff's appropriation, it caused to be inserted in the agreement a clause expressly negativing the idea that it was to furnish water from one of its independent resources, namely, its reservoirs, but was silent as to its other resource, namely, its original appropriation of the natural flow of the stream. But, if we are right in our conclusion as to the conditions under which the contract was drawn, the argument loses its force; for, if it never occurred or was suggested to the government agents that the plaintiff's appropriation was less than 277.86, their failure to make express provision against such a contingency is without significance. No presumption arises from a man's failure to mention a fact of which he is ignorant or to provide against a future event of which he had no thought. Upon the other hand, it is to be inferred from the record that at the time the agreement was reached there was, to say the least, a prevalent doubt whether the natural flow of the river was, during the low-water season, sufficient to cover the plaintiff's appropriation, after supplying all prior rights; and to avoid future controversy as to the meaning of the con-

tract it was the natural and sensible thing to insert language expressly negativing any possible claim that such deficiency as might thus arise should be supplied by the defendant from its storage reservoirs. But, if it was considered that the plaintiff's appropriation exceeded the 277.86 feet, no such provision would be necessary in respect to the defendant's rights as an appropriator, for, its appropriation being subsequent to that of the plaintiff, its right to divert water from the river on account thereof would wholly cease before there could justly be any reduction of the delivery under the plaintiff's appropriation.

Similar considerations are applicable to certain clauses in the preamble which are put forward by the plaintiff as signifying that it was to receive a supplemental supply from an independent source. The recitals are to the effect that the plaintiff was "unable to deliver all the water to which the holders of its certificates of stock and of its water right contracts" were entitled, and that by reason of the execution of the plans of the government "the entire water supply for holders of such certificates and contracts (could) be delivered more uniformly and at less cost." When we remember that because of the necessity of occasionally reconstructing or adding to the plaintiff's diversion dam after the same was washed out or injured by the flood waters in the spring, and of repairing breaks in the upper portion of its main canal, it was unable at times to deliver any water at all, and at other times to deliver up to its normal capacity, these recitals signify nothing more than a recognition of the plaintiff's inability continuously to deliver its maximum appropriation, or at least such part thereof as its patrons required, and the expression of a belief, not that, with the improved system proposed by the government, more water than plaintiff had appropriated would be delivered, but that the water to which it was entitled and which was sufficient for its maximum needs would "be delivered more uniformly and at less cost."

Mention has been made of the strain which plaintiff's construction puts upon certain expressions in the contract, such as the reference to the 277.86 feet as "the vested water right" claimed by the plaintiff and the provision that this amount is "reserved" for the use of its stockholders. But under its view the silence of the instrument in certain respects is equally difficult of explanation. It is conceded that the right upon which the plaintiff must depend for its supply is in point of date or priority subject to judicial determination. The duty of the defendant is not absolute, but is conditioned upon the sufficiency of the flow in the river to supply some appropriation or appropriations, which the contract does not identify, and the dignity of which it does not establish. The theory outlined in the complaint and assumed in the argument is that the defendant is to supply 219.1 feet from the plaintiff's appropriation, which dates from May 23, 1900; that is, deliver the whole of this appropriation, and supplement it with an additional amount of 58.76 feet from its own appropriation of December 4, 1903. But the contract is wholly silent as to the government's appropriation; it is not referred to directly or indirectly. Upon what basis, then, can we rest the conclusion that the defendant agreed to apply 58.76 feet of this appropriation to the plaintiff's use, or that the "priority" of this

277 F.—29

particular appropriation was to be determined by the courts? Why not some other right or appropriation? Moreover, if we adopt the plaintiff's view of the meaning of the word "reserved," and therefore hold that it is equivalent to "granted" or "conveyed," and is not restricted in its operation to the original estate or right of the grantor, the plaintiff here, upon what theory can it be held that the water right which is "reserved" to any extent or at all covers the plaintiff's original appropriation? If "reserved" operates to convey 58.76 feet of the defendant's appropriation, why could and should it not be held to transfer 277.86 feet thereof, leaving the defendant to do as it pleases with the plaintiff's appropriation? And if the word "priority" as used in the sixth paragraph of the contract is to have the effect of establishing the date for 58.76 feet as of December 4, 1903, why should it not be held that it establishes a like date for the whole 277.86 feet? There is nothing in the agreement to tie the right which plaintiff possesses by virtue of the agreement to its original appropriation, excepting only the phrase "vested right" and the word "reserved." But manifestly these terms serve no such purpose if we attribute to them the exceptional meaning for which plaintiff contends. Other practical difficulties with the plaintiff's construction might be suggested, but perhaps the discussion has already exceeded reasonable bounds.

There is thought to be no escape from the view that in entering into the contract both parties unquestioningly assumed that the plaintiff had a vested right to the waters of Boise river in an amount exceeding the 277.86 feet reserved by the contract. Two conclusions necessarily follow: (1) The plaintiff possesses the right to have carried through the defendant's system and distributed to the holders of its stock and contracts 277.86 second feet of water. This is the canal capacity which both parties understood would be required for the plaintiff's needs, and it was upon this basis that they entered into the agreement. But (2) the defendant is bound to divert into and carry through its canal for plaintiff's use only so much water, not exceeding 277.86 feet, as the plaintiff at any time has in the river available for that purpose. The defendant is not bound to resort to its own appropriations to supply the amount. Did the plaintiff have such an available right during the irrigation season of 1912? We have seen that by the decision of the Supreme Court of the state the decree of the trial court limiting the plaintiff's appropriation to 219.1 feet was reversed, and thereupon the decree, of course, became wholly ineffective. In the absence of some judicial determination, it is thought the presumption should be indulged that the plaintiff possessed a right of at least 277.86 feet, in accordance with the assumption of the parties when they entered into the agreement. However, it seems that the action in the state court is still pending, and that the issue touching the duty of water has never been retried pursuant to the directions of the Supreme Court. In the meantime, upon hearings had for that purpose, orders have been entered establishing a basis for the temporary distribution of water; the order for 1912 having been made upon the application of the plaintiff here. No question is made of the validity of these orders, nor is there either allegation or proof that the defendant failed

to deliver the full amount permissible thereunder. That being the case, it follows that the proofs fail to establish a breach of the contract, and the action must be dismissed.

In the discussion it has been assumed that the Secretary of the Interior is not without authority, at his discretion, to make a contract such as this would be if construed in accordance with the plaintiff's views. Nor has place been given to the familiar canon of construction under which grants by the public are to be construed strictly against the grantee; it seems doubtful whether such a rule should be applied in a case like this, where an agency, public though it may be, is engaged in a business enterprise, the burden of which is ultimately borne by private individuals, who in turn receive all the direct benefits therefrom. It has also been recognized that the words "reserved" and "priority" may be used in the sense in which the plaintiff contends they were here employed. It may be added that little has been found in the dealings of the parties with each other subsequently to the execution of the contract or in their practical construction of it which throws any certain light upon the point at issue.

A judgment will be entered dismissing the action.