UNITED STATES v. RAMSHORN DITCH CO. et al.

(District Court, D. Nebraska, North Platte Division. December 20, 1918.)

1. WATERS AND WATER COURSES ☜130—RIGHT OF APPROPRIATION—SEEPAGE WATERS.

Under Rev. St. Neb. 1913, §§ 3426, 3427, and in view of the general statutory scheme for the acquisition of water rights, as well as the repeal of Acts 1895, p. 260, § 44, relating to the appropriation of seepage waters, held, that defendant water company, which had the right to appropriate from the Platte river, was not entitled to appropriate seepage waters escaping from an interstate canal constructed by the United States under the reclamation acts and with the consent of state of Nebraska, which water had been impounded by the United States.

2. WATERS AND WATER COURSES ☜130—APPROPRIATION—ACTION OF STATE BOARD.

Where, under the Nebraska statutes, defendant was not entitled to appropriate seepage waters belonging to plaintiff, held, that the action of the state board sustaining an attempted appropriation gave defendant no rights.

In Equity. Suit by the United States against the Ramshorn Ditch Company and others. Decree for complainant.

Ethelbert Ward, Sp. Asst. U. S. Atty. Gen., of Denver, Colo., A. R. Honnold, Dist. Counsel, U. S. Reclamation Service, of Scottsbluff, Neb., and T. S. Allen, U. S. Dist. Atty., of Lincoln, Neb.

Morrow & Morrow and Fred. A. Wright, all of Scottsbluff, Neb., Willis E. Reed, Atty. Gen. Neb., Charles S. Roe, Deputy Atty. Gen. Neb., and George W. Ayres, Asst. Atty. Gen. Neb., all of Lincoln, Neb., for defendants.

LEWIS, District Judge. This suit was brought to determine whether the defendant, the Ramshorn Ditch Company, had and has the right, as it claims, to divert and apply to irrigation forty-five and four-sevenths second feet of water, or any part thereof, flowing in a ditch or canal constructed by, in the possession and under the control of the plaintiff. All of the defendants, other than the Ramshorn Ditch Company, are State and Water Division and Water District officials who have to do under the State statute with the distribution of water for irrigation between different claimants thereto. The complaint alleges that the Ditch Company has not that claimed right, and prays for injunctive relief.

The facts are these: The plaintiff constructed, maintains and operates a large irrigation system in the valley of the North Platte, a part of which is in and covers lands lying in Wyoming, and the remainder is in this State. Its acts in this respect were authorized by the Reclamation Act approved June 17, 1902 (32 Stat. 388, c. 1093 [Comp. St. §§ 4700-4708]), and the so-called Warren Act approved February 21, 1911 (36 Stat. 925, c. 141 [Comp. St. §§ 4738-4740]). The dam constructed by the plaintiff to impound the flood waters of the North Platte is in the State of Wyoming, and has a capacity of something more than one million acre feet, which expressed otherwise, in cubic contents, signifies a body of water twenty miles long, one and a quarter miles wide, and sixty-four feet deep. As this storage water is released it is permitted to flow down the river to the head gates of large canals on both sides, into which it is taken and carried to the vicinity of lands to be irrigated in both States, from which it is then taken into laterals and delivered to landowners who distribute it over their lands in ditches made for that purpose. The canal with which we are now concerned has a capacity, in Wyoming, of sixteen hundred feet, which gradually becomes less as it extends eastward into this State. It is known as the Interstate Canal. It is taken out of the Platte River on its northerly side in Wyoming about thirty miles west of the State line, and its total length in the two States is one hundred and eighty miles. The laterals constructed by plaintiff have a total length of eight hundred miles. In addition to the lands in Wyoming to be irrigated by the waters in this canal it was contemplated and believed that more than one hundred thousand acres in Nebraska could also be irrigated, consisting of about eighty thousand acres of Government lands, ten thousand acres of State lands, the remainder, lands in private ownership. The territory to be furnished by the canal on the south side of the river is not so extensive, but the project in its entirety is a very large one, and has required several million dollars in its construction and development. The Interstate Canal crosses the State line about the westerly edge of Sheep Creek Valley, and then runs almost due north about five miles before crossing that Creek, thence in a southeasterly direction, and again loops north around the main valley of Dry Sheep Creek. The distance thus covered by the canal as it traverses the two valleys is about twenty miles, so that water escaping in any manner from the canal in that distance would naturally tend to pass down into the troughs in those valleys by surface flow or seepage, the strata under-

lying the soil in that country being sand or gravel. Water from the canal was first applied in this State in 1908, and in 1909 forty-eight thousand acres of growing crops were furnished water under the canal in this State. The lands in the two valleys were irrigated from this source.

Following the trough of Sheep Creek Valley in its course a little to the east of south the distance from the loop of the canal around it to the Platte River is about twenty miles. Dry Sheep Creek Valley, which runs more directly south, comes in to Sheep Creek Valley some four or five miles from the river. There is no evidence that there was ever any natural flow of water in Dry Sheep Creek. In the early days, and up to some twenty years ago, there was a small flowing stream in the upper part of Sheep Creek, but at no time did it reach the river on the surface. Its visible flow accumulated in what are called sinks, just above the sand hills or mounds which lay across the valley about a third of the way down it from the loop of the canal. Below the sand hills and on to the river there was no natural channel. The country there was grassed over. The sinks and the small stream above flowing into them were utilized in the early days by stockmen as watering places, but the flow, and the water in the sinks, gradually grew less and began to disappear several years before the canal was constructed, and stockmen resorted to the sinking of wells, both above and below the sinks, and in this way found water for their cattle. A year or so after water was turned into the canal, and lands in the two valleys were begun to be irrigated, wet places in the two valleys appeared upon the surface. This condition increased from year to year until large pools or small lakes were formed both above and below the sand hills, and these accumulating waters, as they increased, began to form connecting channels and to cut a way in which to flow downward toward the river. This condition of course rendered much of the land which had been irrigable in the two valleys unfit for cultivation. It became marshy and increasingly saturated. Thereupon the plaintiff, at an expense of about $45,000.00, constructed ditches in Sheep Creek Valley, both above and below the sand hills, and thus brought the saturating waters into a common channel directed toward the river. It first turned the waters into a privately owned irrigating ditch, and they were thus carried to the river. Later they increased in volume and spread over the country below. A drainage district was organized to receive the waters from the ditch constructed in the valley by the plaintiff, and it carried them direct to the river, the plaintiff bearing a part of the expense of the drainage ditch. By series of contracts, made in 1912 and 1915, between the plaintiff and the owners of the Farmers' Ditch, the plaintiff obtained the asserted right to turn these waters into the Farmers' Ditch and to use them in irrigating lands under that ditch, and extensions of it to be made, on contracts with landowners, which it claimed the right to make and fulfill by virtue of the Warren Act. For that purpose it constructed concrete Diversion Works at a cost to it of $1450.00, and thus diverted the water in June, 1914, from its ditch into the Farmers' Ditch, and continued to do so during each irrigation season thereafter up to July 21, 1917, on which

day the local Water Commissioner, at the direction of the State Engineer, his superior, came upon the Diversion Works and cut the water out of the Farmers' Ditch, turned it into the District Drainage Ditch, and posted written notices thereat, signed in his official capacity as Water Commissioner, warning the U. S. Reclamation Service and its officers, particularly its Project Manager, that in accordance with the provisions of the Irrigation Laws of the State of Nebraska the head gate of that diversion into the Farmers' Ditch had been opened (closed) "for the purpose of delivering water to appropriation 1465" (Ramshorn Canal Company), and that the head gate must not be opened or interfered with until permission should be received from some officer of the State Board of Irrigation, Highways and Drainage. The Ramshorn Canal was below the Farmers'. It crosses the District Drainage Ditch; and as the water thus turned into the District Drainage Ditch by the Water Commissioner came down to the point of crossing it was turned in to the Ramshorn Canal and used for the irrigation of lands under it.

The Interstate Canal carries about twelve hundred second feet of water where it reaches Sheep Creek, and the evidence leads to the conclusion that the loss from the canal by seepage in the twenty miles around the heads of the two Sheep Creeks is from thirty-eight to forty second feet, and that the loss in the irrigation laterals under the canal in the same vicinity is about forty second feet. In addition, the amount of seepage in the two valleys was increased by irrigation, but there is no testimony from which that can be approximately estimated. The flow in the ditch constructed by the Government varies from thirty-five to eighty second feet at the Diversion Works. Ordinarily it amounts to about forty to fifty second feet. The plaintiff did nothing in the way of draining the seeped lands in Dry Sheep Creek Valley. That work was done by private landowners, and the flow in plaintiff's ditch above the Diversion Works is considerably augmented from that source.

Section 8 of the Reclamation Act accepts the requirements of local laws "relating to the control, appropriation, use or distribution of water used in irrigation," and it requires that "the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws."

The State Constitution has no provision relating to the appropriation and use of water, but the legislature, by various acts, has completely covered the subject. By Act of 1895:

"The water of every natural stream not heretofore appropriated within the State of Nebraska is hereby declared to be the property of the public and is dedicated to the use of the people of the state, subject to appropriation as hereinbefore provided" (Rev. Stat. 1913, § 3370); "as between appropriators, the one first in time is first in right" (section 3371); "the right to divert unappropriated waters of every natural stream for beneficial use shall never be denied * * *" (section 3372); "the priority of such appropriation shall date from the filing of the application in the office of the State Board" (section 3373); "it shall be the duty of the Board to make proper arrangements for the determination of priorities of right to use the public waters of the state, and determine the same" (section 3400); "as the adjudication of a stream progresses, and as each claim is finally adjudicated, it shall be the

duty of the State Board to make and cause to be entered of record in its office an order determining and establishing the several priorities of right to use the water of said stream, and the amount of the appropriation of the several persons claiming water from such stream and the character and kind of use for which such appropriation shall be found to have been made" (section 3403); "each appropriation shall be determined in its priority and amount by the time at which it shall have been made and the amount of water which the works are constructed to carry" (section 3404); "the State Board of Irrigation, Highways and Drainage is given original jurisdiction over all matters pertaining to water-rights for irrigation" (section 3407).

Appeal from the action of the Board to the Supreme Court is provided for. Section 3412 provides that application must be made to the State Board before the appropriator commences the construction, enlargement or extension of any works for the purpose of appropriating any of the public waters of the State. It expressly provides that the United States of America, and every person, association or corporation may make the appropriation. These provisions of the local statute have express reference to the "waters of every natural stream," also designated as "the public waters of the state." The Board does not ordinarily deal with flood water that, unless stored and held for use during the irrigation season, would otherwise pass on down the stream. The State Legislature, by section 3455, Rev. Stat. 1913, expressly authorizes the United States to appropriate and store such waters in conformity with the Reclamation Act (32 Stat. 388), and also recognizes the right of the United States to dispose of such waters in accordance with the provisions of the Warren Act. The United States made its original application (No. 768) to the State Board on September 9, 1904, in conformity with the eighth section of the Reclamation Act and the State statutes, for a permit to construct its reservoir in the State of Wyoming and to store therein the unappropriated waters of the North Platte River, to bring them into this State in its canals and to distribute them therefrom for irrigation; and it was by that Board allowed a priority for that purpose under that number and of that date. By subsequent orders of the Board the time for completing the canals under said application was extended to September 1, 1919, and for completing the application of water to the land, to September 1, 1924. The application is voluminous. It sets forth a description, by legal subdivisions, of many thousand acres of land in both States, and in addition contains this:

"Interstate Canal. This canal contemplates the enlargement of the Whalen Falls Canal and continued easterly to the limit of irrigable land, and the right to irrigate all the irrigable lands on the north side of the North Platte River, supplementing those without adequate supply at any season and furnishing full right to all others."

The application discloses the entire project in the two States. The order of the State Board approving and allowing the application, made on February 14, 1905, recites, among other things:

"The lands to be irrigated under this permit being all lands described in said application which lie within the State of Nebraska and are not covered by prior existing rights."

On April 3, 1911, the plaintiff filed with the State Board its appli-cation to appropriate the waters in the ditch which it had constructed in Sheep Creek Valley. The State Engineer, acting as secretary of the Board, made objection to the application that it was not specific in some respects, and gave thirty days to the plaintiff for amendment. At that time section 44 of the Legislative Act of 1895 was in effect. It was as follows:

"All ditches constructed for the purpose of utilizing the waste, seepage, swamp, or spring waters of the State shall be governed by the same laws re-lating to the priority of right as those ditches constructed for the purpose of utilizing the waters of running streams; provided, that the person upon whose lands the waste, seepage, swamp, or spring waters first arise shall have the prior right to the use of such waters for all purposes upon his lands."

Pending the time given to amend the application that section of the Act of 1895 was repealed, and thereupon, and before the thirty days expired, the application was dismissed and the Board declined to fur-ther hear the applicant. This course taken by the Board appears to be due to its opinion at that time that since the repeal of the statute there was no provision under which such waters could be appropriated, and that the statutes in that respect were applicable to the waters of nat-ural streams only.

The Ramshorn Ditch Company has an old appropriation from the North Platte, which is known as Docket No. 945. Its date is March 20, 1893, and is for forty-five and five-sevenths second feet. The head gate of that ditch is on the north bank of the river at the lower edge of the two Sheep Creek draws or valleys. The river is broad and shal-low, and owing to the formation of sand-bars or islands opposite the head gate, due to the shifting river sands, it is difficult and expensive for the Ramshorn Company to maintain diversion works in order to receive the amount of its appropriation into its head gate and ditch. But the evidence does not disclose that the amount of the natural flow in the river is not sufficient at all times to supply the Ramshorn prior-ity. On the contrary it appears that it is at all times ample for that purpose. But the Ramshorn Company was constantly put to great ex-pense in maintaining its diversion works. It saw that if it could get the water in plaintiff's ditch it would be rid of that expense. So on June 13, 1913, it filed its application with the State Board for an ap-propriation of the waters in controversy. Among other things which it sets forth in its application is this:

"That the source of the proposed appropriation is seepage water accumu-lating in the Sheep Creek basin or draw which does not naturally connect with the North Platte River. That the amount of the appropriation desired is forty-four (44) cubic feet per second of time. That it is proposed to locate the head gate on the east bank of a ditch which will collect the seepage water and convey it to said Ramshorn Ditch"

—and that the total cost would be $3,100.00. On February 23, 1914, the Board dismissed the application—

"for the reason that a prior appropriation has been granted and is in use on the lands that are asked to be irrigated under this application."

The Ramshorn Company filed with the Board on May 11, 1914, a petition for a rehearing of its application; and notwithstanding the fact that the District Drainage Ditch, which was constructed by the plaintiff and the Morrill Drainage District to carry these waters to the river when they were not turned into the Farmers' Ditch was ample for that purpose, and had been completed in July, 1913, the verified petition for a rehearing, among other things, recites:

"Your petitioner further represents that it is necessary to collect and drain away these seepage waters to prevent serious damage to adjacent farms and other property. That drainage is an expensive burden unless the water can be used so as to compensate therefor. That the water in question is not public waters of the state and is not taken from a natural stream."

There is no proof that the rehearing was granted; but the Ramshorn Company filed its second application for an appropriation of these same waters, on September 12, 1916, in which it represented that the source of the appropriation is "seepage water rising in the Sheep Creek basin." The amount desired is forty-five and five-sevenths second feet, and "that it is proposed to locate the head gate of the said water collected in drain ditch at siphon under Tri-State (Farmers') Canal." (This is near the point at which the waters can be interchangeably turned through plaintiff's concrete Diversion Structure either into the Farmers' Canal or taken down under that Canal and thence into the District Drainage Ditch on to the river.) This application was granted on September 22, 1916, subject to certain limitations and conditions, among which are:

"The prior rights of all persons who by compliance with the laws of the State of Nebraska have acquired a right to the use of the waters of this stream must not be interfered with by this appropriation. The amount of the appropriation shall not exceed 45$^4$/$_7$ cubic feet per second of time. * * * This appropriation shall be supplementary to and part of the original appropriation covered by Docket No. 945, Ramshorn Ditch Company, and shall take the same priority as Docket No. 945."

It is on this action of the Board that the Ramshorn Company claims the right to take and use this water; and the Water Commissioner, in taking the steps which he took in diverting the water from the Farmers' Ditch so that it could go down the District Drainage Ditch to the Ramshorn Ditch, justifies his action under the same order.

The foregoing are all of the material facts necessary for consideration in reaching a conclusion on the merits of the controversy.

[1, 2] In addition to the foregoing legislative acts, wherein provision is made for the appropriation of "the water of every natural stream," it is necessary to consider, in determining the rights of the parties, two sections of the Act of 1913, now embodied as sections 3426 and 3427, in Nebraska Revised Statutes, as follows:

Sec. 3426. Any person, persons, district, company or corporation owning, constructing or operating an irrigation canal in this state, are hereby authorized to collect or assist to collect any seepage water thereunder or under any adjacent irrigation canal by the construction of drainage ditches and to apply said waters to irrigate with on the lands covered by the original appropriation of such canal, while said seepage waters are being conducted by said drainage ditches toward the natural streams.

Said use to be subject to limitations as follows:

(1) The right of any land owner to raise, pump, develop and use on his own land water percolating thereunder shall not be impaired.

(2) Seepage waters so collected by the canal owner or operator shall be treated as supplemental to and part of the original appropriation of such canal, the total quantity of which shall not be increased nor exceed an aggregate of three acre feet in any calendar year for each actually irrigated acre of land.

Sec. 3427. When any seepage or drain water is mingled with that of any natural stream, it shall become part of the public waters of the state, subject to diversion among existing appropriators of the State of Nebraska, in the order of their respective priorities and rights based upon preferential use as defined by the laws of the State of Nebraska.

These are special provisions on the subject of seepage water. This statute gives the first right to him who may develop them on his own land, to use them and to use all of them, if he so desires, on his own land, and any water that he may so develop and use is not charged against an appropriation that he may have of water from a natural stream. They are not counted as a part of his appropriation, if he have one. They do not supplement it. The owner of an irrigation canal has the right to collect seepage water from it "by the construction of drainage ditches and to apply said waters to irrigate with on the lands covered by the original appropriation of such canal while said seepage waters are being conducted by said drainage ditches toward the natural streams." If seepage waters under a canal are thus collected and used they "shall be treated as supplementary to and part of the original appropriation of such canal."

Section 3426 is silent of any intention to require applications to the State Board in the same manner that is required to perfect an appropriation of water from a natural stream before the right given by the statute attaches. Certainly the landowner who develops water under the provisions of that section is not required to take action before the Board before he obtains the right to use the developed water on his land. And as to the canal owner who collects the water for use, it is expressly provided that the water so collected shall be treated as a part of the original appropriation of such canal. It does not contemplate a proceeding before the State Board through which an applicant canal owner may obtain an original and independent right to the use of additional water over and above his prior appropriation. Its sole purpose, by its terms, is to grant him the right to collect and use such water, charging him with it, in the event he does so, against his original appropriation. It was a practical view to take of the subject-matter. Seepage, leakage, waste and return waters are all of uncertain quantities, variable from season to season. They may disappear altogether, and cannot be depended upon. If their source be leakage from the canal or laterals, that may be wholly stopped by an impervious structure at a later date; if their source be irrigated lands, irrigation may be suspended or wholly stopped, and the seepage would consequently cease. The other sections of the statute in relation to proceedings before the State Board all have to do with stream flow, denominated public waters, and declared to be the property of the public, and provide for the acquisition of the individual's right to use them by having them respectively determined and adjudicated by the

Board and a permanent record made fixing priorities. The rights thus to be fixed by the Board are permanent in character, and can be exercised by the owners according to their priorities during each season. The difference between the right thus acquired and that given by section 3426 is obvious. Seepage water is not dependable; its permanent flow and use cannot be expected. The Legislature treated it in this view. If collected and used, the amount used is charged against the original appropriation of the canal. Whether or not it is being used is constantly under the eye of the Water Commissioner, whose duty it is to see to the distribution and use of water in his district. Section 44 of the Act of 1895, repealed in 1911, had to do only with possible disputes between those using seepage from the same source, and there may have been an implication that those disputes were subject to adjudication by the Board in the same manner as the right to take water from a natural stream should be determined. There is no basis for such an implication in Section 3426, enacted two years later to cover the same subject-matter. I am of the opinion that this section gives the right and defines the conditions under which it can be acquired, and the limitations to which it can be applied, that the statute, ex vi termini, grants the right on compliance with its requirements; and that it is not within the jurisdiction of the State Board to pass upon and determine in whom or when it attaches. The plaintiff collected the seepage waters and was using them to fulfil its Warren-Act contracts. The lands on which they were being applied by it, and the ditch in which it was being conducted to those lands, brought them nearer to the natural stream which they, if unobstructed, would have finally reached. The Ramshorn Company, after it induced the Water Commissioner to turn them into its canal, also applied them to irrigate lands on the same water-shed. But the Ramshorn Company took no part in developing and collecting the seepage water. It did nothing and spent nothing for that purpose. It never complied with the requirements of section 3426. When they reached the line of its canal, after being turned down the District Drainage Ditch by the Water Commissioner, it diverted these waters into its canal at a nominal expense. The amount of water which it claimed a right to appropriate from the ditch of the plaintiff, in its petition to the Board, is identical with the amount of its original appropriation from the river. Its purpose is obvious. It was seeking to obtain water from some other source than the source of its original appropriation so that it could avoid the expense of maintaining diversion works in the river's shifting sands. Considering both of its applications, the one dismissed and the one finally granted, it represented to the Board that it had collected, or intended to collect, the waters in controversy at great expense to it. It sought to make the Board believe that it had complied with the requirements of section 3426, and the action of the Board in granting its last petition must have been on the assumption that it had done so, but confessedly this is not true.

Counsel for the Ramshorn Company devote a large part of their brief and argument in support of the proposition that seepage water is a part of the natural stream which it would, in natural course, finally

reach and add to the stream flow; and cite, among other cases, Irrigation Co. v. Campbell, 2 Idaho, 411, 18 Pac. 52; McClintock v. Hudson, 141 Cal. 275, 74 Pac. 850; Los Angeles v. Hunter, 156 Cal. 603, 105 Pac. 755; Irrigation Co. v. Irrigation Co., 31 Colo. 62, 72 Pac. 49; Josslyn v. Daly, 15 Idaho, 137, 96 Pac. 568; Comstock v. Ramsay, 55 Colo. 244, 133 Pac. 1107; and Durkee Ditch Co. v. Means (Colo.) 164 Pac. 503. The proposition is relied upon in refutation of the plaintiff's claim that the right to collect and use these waters belongs to it because they are flood waters and were brought in by it through its canal, that before it brought them in the seeped water here in controversy did not exist, and that by virtue of these facts the water should be considered as developed or new water, to which plaintiff should be given the first right until the seepage in fact reaches the river flow. The rule for which counsel contend is undoubtedly established beyond controversy by the authorities they cite, on the state of facts developed in those cases. The facts in each of those citations were alike. The question presented to the courts was, Whether or not leakage, seepage, waste, return and percolating waters could be collected and then diverted and used for irrigation so as to decrease the natural flow of the stream, to the detriment of prior appropriators below, whose appropriations had been fed by the underground waters before they were diverted. The specific question here involved, Has the canal owner the right to collect and use on his original appropriation waters which leak from his canal and laterals? was not up. The Comstock case is typical. The court said:

"That appropriators of water out of a natural stream for irrigation purposes with priorities decreed are entitled to have the conditions substantially maintained on the stream as they were when the appropriations were made and have existed during the continuance and perfection of such appropriations"

—and the court held that to cut off such waters by intervening works between the point where they escaped and where they would naturally reach the stream, from the lower appropriators, was the same thing in practical effect as to cut off a natural tributary to that stream. It announced the principle, and cited much authority in support, that seepage waters which contribute to the natural flow and thereby supply appropriators farther down are not subject to new and independent appropriation and diversion when there is thereby an interference with the right of use by prior decreed appropriators from the stream. And it was declared in that case, and in the others cited, in effect, that seepage waters are a part of the natural stream which they would finally reach from the moment they escape from control, for the protection of rights there under consideration. But the Ramshorn Company presents no facts here calling for the application of that principle in its behalf. The right of a canal owner like the one here claimed by plaintiff was not involved or considered in any of those cases, and there is no complaint here by the Ramshorn Company that the use that the plaintiff was making of these waters at the time it caused them to be turned into its ditch decreased or lessened the flow of the stream above the Ramshorn head gate, to its injury, so that it was thereby not able to

get from the river its appropriation. It may be seriously questioned whether the doctrine of these cases can be accepted in this jurisdiction in view of Section 3427, but the facts here presented are such that a definite construction of that section is not required. The State Supreme Court may later have occasion to give us its full effect. We will wait until it speaks on the subject, unless it become unavoidable that we construe it. Furthermore, the contention puts the Ramshorn Company in a doubtful attitude. It can hardly be heard to say that the seepage water is a part of the stream and must be permitted to find its way to the body of its flow, in the absence of proof of damage to some appropriator by its interception, and at the same time claim a right to participate and become a beneficiary in the obstruction of that flow, and to make a new diversion and use of the water. Its attitude is contradictory. The legal proposition it advances is sound, when confined to a condition of facts on which it rests, but has no application here. To carry that principle to the length of holding that because seepage waters under certain conditions are considered a part of the stream, and the State statute gives a right to appropriate waters of the stream, therefore seepage waters may be appropriated within the literal terms of the State statute, cannot be acceded to. The State statute did not give the right to appropriate and take the waters in the plaintiff's ditch. The action of the State Board on September 27, 1916, was no more than a declaration on its part that the Ramshorn Company had, in the opinion of its individual members, complied with the requirements of section 3426, and inasmuch as it had no authority to take official action on that subject-matter its order did not give to or establish any right in the Ramshorn Company. The conclusion follows that the Ramshorn Company has no right to take the water from the plaintiff's ditch against its objection and protest, and that the Water Commissioner acted beyond his official authority and without right when he went upon the plaintiff's diversion structures on the ditch and turned the water flowing therein into the Ramshorn Ditch; that as against the Ramshorn Company the plaintiff has the right to be unmolested in the possession of its ditch, the right-of-way thereto and the diversion structures thereon, and to use or dispose of the flow in such a way as it may desire.

A decree as prayed in the bill may be prepared and submitted.