## UNITED STATES v. HAGA et ux.

(District Court, D. Idaho, S. D. August 10, 1921.)

No. 846.

1. **Waters and water courses ⬡152(2)—Appropriator from stream can object to diversion from tributary only when actually injured.**

   An appropriator from a main channel can complain of a diversion from a tributary only if and when such tributary would, if not interfered with, make a valuable contribution to the main stream.

2. **Waters and water courses ⬡143, 151—Appropriator who has applied water to irrigation is entitled to wastage, so long as not abandoned.**

   An appropriator who has diverted water and devoted it to irrigation purposes is entitled to its exclusive control, so long as he is able and willing to apply it to beneficial uses, and such right extends to what is commonly known as wastage from surface run-off and deep percolation necessarily incident to practical irrigation; nor is it essential to his control that he maintain continuous actual possession of such water, but so long as he does not abandon it or forfeit it by failure to use, and can identify it he may assert his rights.

3. **Waters and water courses ⬡130—Water escaping from irrigation system not subject to appropriation by another.**

   Comp. St. Idaho, §§ 5556, 5558, providing that all of the waters of the state when flowing in their natural channel are the property of the state and that the right to the use of waters of rivers, streams, etc., may be acquired by appropriation, do not apply to wastage water from an irrigation system though flowing in the natural channel of a stream.

4. **Waters and water courses ⬡130—Statute regulating use applies only to public waters.**

   Comp. St. Idaho, § 5562, providing that "all ditches * * * constructed for the purpose of utilizing seepage, waste, or spring water of the state, shall be governed by the same laws applicable to ditches * * * constructed to utilize waters of running streams," has relation only to public waters of the state subject to appropriation, and does not authorize the construction of ditches to utilize seepage or waste water rightfully under the control of another.

5. **Waters and water courses ⬡130—Government project held entitled to so much of its wastage water as could be identified in a creek.**

   Defendant for irrigation of his land diverted water from a creek which had a natural flow only during early spring, the water which it carried later being overflow and seepage from lands irrigated in part by water owned by an irrigation company which had abandoned such wastage, and in part from lands under an irrigation project of the United States which had not abandoned its wastage. *Held*, that defendant was entitled to the use of the natural flow and of the wastage from the irrigation company lands, but that the government was entitled to such share of the later flow as could be determined as coming from the lands within its project.

In Equity. Suit by the United States against Oliver O. Haga and wife. Decree for plaintiff.

James L. McClear and B. E. Stoutemyer, both of Boise, Idaho, for the United States.

Richards & Haga, of Boise, Idaho, for defendants.

DIETRICH, District Judge. The defendant owns 320 acres of land on Eight Mile creek in Ada county, Idaho. For its irrigation he maintains two ditches diverting water from the channel of the creek. Con-

structively, at least, the creek is a tributary of Boise river. The land is within the boundaries of a large tract for the irrigation of which the government has constructed an expensive irrigation system commonly referred to as the Boise-Payette or Boise project. This system heads in the south bank of the Boise river and supplies water to more than 150,000 acres, including a considerable area within the Eight Mile creek drainage, a short distance above the defendant's lands. In constructing the system the Secretary of the Interior took over the New York Canal under an agreement with the owning corporation, the stockholders of which were farmers holding lands to which it supplied water. By the agreement the government became the owner of the existing canals and ditches, with the right to enlarge and alter them as it might see fit; but the canal company and its stockholders reserved the water right appurtenant thereto, with the understanding that the water owned by them would continue to be delivered through the enlarged system, their only obligation being to pay a ratable part of the expense of maintenance and operation. This arrangement was made in 1906, whereupon the government took possession of the system, greatly increased its capacity, built an extensive distributing system, and also constructed two reservoirs, the Deer Flat, for the lower reaches of the project, and Arrowrock, upon the river itself, a few miles above the head of the main canal.

Admittedly, during the early springtime at least, Eight Mile creek received a little water from the natural drainage, but it is further to be conceded that after the commencement of the irrigation season most of the water flowing in the channel at the head of the defendant's ditches has its source in surface waste and seepage incident to the use of water from the government canals in the irrigation of lands lying along or near the creek above the defendant's points of diversion. The government has made provision for the utilization of all the water flowing in the creek for the irrigation of project lands, and the question in controversy is whether it or the defendant has the better right. Perhaps it should be added at this point that the government is an appropriator of a large amount of the natural flow of Boise river for direct use upon the project lands, and also impounds in the Arrowrock reservoir a large volume which it releases in the latter part of the season when the river is low, and diverts into its canal system in the same manner as the natural flow. Its rights as an appropriator are subsequent to those of the New York Canal Company and of other large ditch companies diverting water at various points farther down the river, some above and some below the mouth of Eight Mile creek.

The contention of the government is, first, that, assuming the creek to be a tributary of the river and the water therein to be natural flow, the river and its tributaries are to be deemed to be a single unit; and inasmuch as the defendant's appropriations are subsequent to many of the large appropriations directly from the river, the government has the right to demand that the water of the creek be permitted to go to the river to supply such early rights in order that there may be left in the river at the point of its diversion, higher up, an equivalent amount to supply its right, which is prior to the larger of the defend-

ant's appropriations. While as a general principle of law the correctness of the proposition may be conceded, the position is thought to be untenable for these reasons:

[1] (1) While, as already stated, the creek is constructively a tributary of the river, there is no showing that naturally, during the irrigation season, it actually makes any contribution to the river flow. There is a continuous channel, it is true, and there are doubtless short periods of unusual run-off in extraordinary seasons when there is a discharge into the river; but the showing is insufficient to warrant a holding that the older diversions from the river have any substantial beneficial interest in the creek. An appropriator from a main channel can complain of a diversion from a "tributary" only if and when such tributary would, if not interfered with, make a valuable contribution to the main stream.

(2) In the second place, there is no warrant for finding that in normal seasons there is any natural flow in the creek later than June 1st, whereas up to about July 1st, and sometimes to a later date, there is an abundance of water in Boise river proper for the supplying of all rights therein, and hence the use of the creek by the defendant infringes no appropriator's right. It follows that plaintiff is not in any way injured by the defendant's diversion of the natural flow of the stream.

The second contention is that substantially all of the water in the creek during the irrigation season comes from plaintiff's canals by the way of surface waste from irrigated fields and the seepage of percolating waters from the same source, and that plaintiff has a superior right to pick up this water and apply it to other beneficial uses upon the project. In point of fact, I think it must be found that except for a very short period in the spring the amount of natural flow in the creek is negligible. It is insufficient either in volume or continuity of flow to be susceptible to beneficial use in irrigating farm lands. In an exceptional year an unusually heavy rain may result in a temporary run-off, but from the evidence as a whole the conclusion is irresistible that the stream in its natural state is not dependable as a source of irrigation even in May; and generally speaking, after May, the creek is only a dry channel.

[2] In point of law the general principle upon which the plaintiff relies is scarcely open to controversy; one who by the expenditure of money and labor diverts appropriable water from a stream, and thus makes it available for fruitful purposes, is entitled to its exclusive control so long as he is able and willing to apply it to beneficial uses, and such right extends to what is commonly known as wastage from surface run-off and deep percolation, necessarily incident to practical irrigation. Considerations of both public policy and natural justice strongly support such a rule. Nor is it essential to his control that the appropriator maintain continuous actual possession of such water. So long as he does not abandon it or forfeit it by failure to use, he may assert his rights. It is not necessary that he confine it upon his own land or convey it in an artificial conduit. It is requisite, of course, that he be able to identify it; but, subject to that limitation, he may conduct it through natural channels and may even commingle it or suf-

fer it to commingle with other waters. In short, the rights of an appropriator in these respects are not affected by the fact that the water has once been used. U. S. v. Ramshorn Ditch Co. (D. C.) 254 Fed. 842; Ramshorn Ditch Co. v. U. S. (C. C. A.) 269 Fed. 80; McKelvey v. North Sterling Irr. Dist., 66 Colo. 11, 179 Pac. 872; Lambeye v. Garcia, 18 Ariz. 178, 157 Pac. 977; Hagerman Irr. Co. v. East Grand Plains D. District, 25 N. M. 649, 187 Pac. 555; Griffiths v. Cole et al. (D. C.) 264 Fed. 369; Twin Falls Canal Co. v. Damman (this court No. 689, oral decision rendered September 19, 1919, filed August 20, 1920) 277 Fed. 331.

[3] In no wise is this view out of harmony with the provisions of the Idaho statute cited by the defendant. Section 5556 of the Compiled Statutes declares only that "all the waters of the state, when flowing in their natural channels," etc., are the property of the state and subject to its supervision, and section 5558 further provides that "the right to the use of the waters of rivers, streams," etc., may be acquired by appropriation. But the waters under discussion diverted from the Boise river and carried many miles through the plaintiff's costly system of artificial canals and from them indirectly discharged into Eight Mile creek are not "flowing in their natural channels." If all water flowing in a natural channel is subject to appropriation, then water released from the Arrowrock reservoir is subject to appropriation and diversion by a stranger the moment it is discharged from the reservoir into the river below, to be carried down to the head of the plaintiff's canal; but no one would make such a contention. It is a familiar rule that an appropriator may utilize a natural channel for conveying his water, and may even dump his water into a running stream and take it out again lower down, so long as he does not interfere with existing rights.

[4] Section 5562 provides that—

"All ditches * * * constructed for the purposes of utilizing seepage, waste, or spring water of the state" are governed by the laws applicable to ditches constructed to utilize "waters of running streams."

True, but the section neither expressly nor impliedly authorizes citizens to construct ditches to utilize seepage or waste water rightfully under the control of another, any more than it does the construction of ditches to utilize springs already appropriated by another or the water of a running stream. In any case, whatever may be the classification of the water source, the water must belong to the state. It must be public water subject to appropriation. I find no suggestion to the contrary in the Idaho decisions to which my attention has been drawn. Le Quime v. Chambers, 15 Idaho, 405, 98 Pac. 415, 21 L. R. A. (N. S.) 176; Gerber v. Nampa & Meridian Irr. Dist., 16 Idaho, 1, 100 Pac. 80; Bower v. Moorman, 27 Idaho, 162, 147 Pac. 496, Ann. Cas. 1917C, 99. Of course, as was said by the Colorado Supreme Court, in La Jara Creamery Co. v. Hansen, 35 Colo. 105, 83 Pac. 644, "after waste waters reach the [natural] stream, unless there is then an intention by the owner to reclaim them, they become part of its volume" and are subject to appropriation; but that is only to suggest the possibility of losing the right by abandonment.

In the light of these principles we pass to a consideration of the facts.

Responding first to certain suggestions in the briefs, I have no hesitation in holding without discussion that Eight Mile creek is a natural water course or channel. It is further thought, and for the purpose of this decision it will be assumed, that in so far as material here the status of the government is like that of any other appropriator; its rights and obligations are no greater and no less. And I may add that presumably the suit was brought and is prosecuted with due official authority.

Aside from such slight natural flow as there may be in the creek from time to time in the early part of the season, its waters at any given date come from one or more of three possible sources. In the first place, some of the lands in the creek basin above defendant's diversion from which there is a run-off, either surface or subterranean, belong to stockholders of the New York Canal Company and receive water out of the appropriation of that company, which, as has already been stated, it reserved when it turned over its canal system to the government in 1906. In the second place, there are project lands, in the strict sense, which in the early part of the season are irrigated with water diverted from the natural flow of Boise river under the government's appropriation. In the third place, all of these lands, of both classes, receive water from the Arrowrock storage, the first of such storage water being delivered about July 1st, and the amount gradually increasing thereafter as the river supply falls off until about the first of August, and from that time forward all of the water delivered to any of the lands is storage water.

An application of the general rule as discussed, to the undisputed facts, leaves no room for doubt of the right of the plaintiff to follow the wastage from this storage water so far as it can be identified. Clearly, it has never intended to relinquish such rights, nor is there any ground upon which to rest a finding of forfeiture. The reservoir was not completed and put into service until 1915, and at that time the plaintiff's distributing system was so constructed and it had done such work on the channel of the creek as to enable it to pick the water up and send it on for use on project lands in the Nampa & Meridian irrigation district. In any possible view of the law defendant's interference was not so continuous or of such character as to confer upon him any right to such water or to divest the plaintiff of any right, nor as to this water is there any substance in fact to the defense of estoppel.

Upon the other hand, it is thought that the plaintiff has failed to establish a superior right to the wastage from the use of water under the original appropriation of the New York Canal Company and its stockholders. In the case of the New York Canal Co. v. United States (this court, No. ——) 277 Fed. 444, the government successfully contended that it acquired no interest in this water, but the title thereto was reserved and that its only obligation in relation thereto was to divert it and deliver it through the enlarged system to the canal company's stockholders (decision December 31, 1913). If it does not own the primary rights, of course, it is a stranger to the wastage. The con-

tract of July 1, 1918, between the New York Canal Company and the government, in no wise alters the case. This instrument expressly refers to the original and unconveyed right of the canal company as a "vested" right, and taken as a whole clearly evidences the intention of the parties that such right was to remain intact and unaffected by the new agreement, the subject-matter of which was an additional or supplemental right to be supplied by the government from storage water. Paragraph 21 in explicit terms reserves to the government wastage from water supplied by it as distinguished from wastage incident to the use of the vested right. At the end of the paragraph is found an equivocal general clause to the effect that there is "reserved" to the United States "any other waste water not heretofore applied to beneficial use"; but the word "reserved" is not an appropriate term to express the idea of transfer or conveyance, and it is quite incredible that the parties understood and used it in an exceptional sense when it is noted that the contract as a whole so carefully guards the "vested" right of the canal company (which necessarily included the right to the wastage incident to the use of the primary right), and at the same time so carefully and explicitly "reserves" in the government as grantor the right to wastage from the water it and not the canal company owns and supplies, while making no specific reference to wastage from the vested right. But if a different view were to be taken, it is still further to be observed that even this general clause purports to "reserve" only "any other waste water not heretofore applied to a beneficial use," and such waste as the defendant is now claiming, he had been using for beneficial purposes for ten years prior to the execution of this contract. And here the further consideration is suggested that whatever may have originally been the right of the New York Canal Company, it was in 1918 without the power to convey this waste water to the government for use upon lands for which it was not appropriated or diverted. For approximately 18 years it and its stockholders had caused or permitted the water to pass from their lands into a natural channel physically tributary to the stream from which it had been originally diverted, and to "waste" in a very real sense. Defendant's lower ditch was constructed in the early nineties, so that during all of this 18 years he was making beneficial use of a part of the water. His upper ditch was constructed in 1908, after several years of open abandonment of the water by the canal company, and thereafter he continued to divert the water through the upper ditch without interference or objection for five years, up to the time the second contract between the canal company and the government was entered into, during all of which period the canal company continuously permitted the water to waste and manifested no intention to recapture or again to use it. Clearly, it must be held to have abandoned such right as it may have had; at least, it could not under such circumstances reclaim the water and dispose of it to a third person to be used in any other territory, to the detriment of one who in good faith had appropriated it and was using it for beneficial purposes. While we are not expressly advised of the views or motives of the reclamation officials in 1910, when certain construction work was done for the purpose of enabling the

government to deliver water from the channel of Eight Mile creek into the Ridenbaugh system for use on project lands, it may fairly be inferred that the plan adopted was worked out in recognition of the fact that defendant had superior rights to at least some of the flow of the creek.

Considering now the third source from which the creek is supplied, the wastage from project lands to which the government supplies water out of its appropriation of the natural flow of the river, it is manifest that primarily the right of the government to such water is the same as its right touching wastage from the use of storage water. The distinction, if any there may be, must be found in the facts relating to the claim that this right has been abandoned or forfeited or that the plaintiff is estopped to assert it. But upon consideration of the evidence I am not convinced that any one of these defenses is sustained. That there never was any conscious intent or purpose to abandon is scarcely open to controversy; nor, under all of the circumstances, can it be held that there was unreasonable delay in asserting the right. While the government took over the New York system in 1906, it, of course, was not in a position to furnish water out of its own appropriation until it had enlarged the capacity of the canals. For this work time was required, and while some additional water was furnished perhaps as early as 1908, the system was not completed until a recent date, and in the meantime water was not delivered upon a permanent basis. The form of application for water rights prepared by the reclamation service contained a provision reserving to the government the right to reclaim waste water. Public declaration of its intention to reserve all waste and percolating waters was made as early as 1913, in the annual report of the service, and in 1910 provision was made by which water in Eight Mile could all be used for the irrigation of project lands. It is true that defendant continued to make use of the stream; but, as we have seen, he could use a portion thereof without infringing any right of the government, and as between the parties there seems never to have been a clear definition of their respective claims or a disclosure of how far they were in conflict. From year to year defendant purchased water from the plaintiff, the amount thereof in at least 1918 and 1919 being apparently sufficient for the full irrigation of his lands. It may also be added that there were negotiations between the parties looking to the purchase by defendant of an adequate and permanent right.

Even if we assume that in carrying on such an enterprise the government is fully subject to the principle of estoppel, the evidence does not establish such a defense. The most that can be said of the construction work performed in 1910 upon which the defendant chiefly relies is that its implications are equivocal. From the conduct of the reclamation service in relation thereto a recognition of some right in defendant is inferable, but not necessarily the right to use all of the water flowing in the creek. An intention to recognize only partial right is quite as reasonable. At that time the government could have been supplying but little water out of its own appropriation to the lands

in the creek basin, and, as we have seen, it had no right to waters wasting or coming from other sources.

[5] My general conclusion therefore is that the plaintiff is entitled to be protected in the reclamation and use of water coming from water which it supplies, but as against the defendant it is without right in the natural flow of the creek or in the waste from the "vested" water rights of the New York Canal Company and its stockholders. Identification of the water to which it is thus found to be entitled is necessarily attended with a measure of uncertainty, but an approximation is thought to be practicable. It is stated in the defendant's brief, and I am assuming the statement to be substantially correct, that the evidence shows a total irrigated area draining into the creek of 1,500 acres, 1,050 acres of which is supplied by the New York Canal "vested" right, and the remainder of 450 acres from the government right. There is from time to time in the early part of the irrigation season, and not later than June 1st, a small amount of "natural" water in the channel. During the month of July there is a gradual falling off of the natural flow in Boise river for both the New York and the project lands, and the growing deficiency is provided for from the Arrowrock storage. After August 1st the entire supply is from such storage. Bearing in mind all these considerations, it is thought that up to August 1st the defendant is entitled to divert $^7/_{10}$ of the flow in Eight Mile creek and the plaintiff $^3/_{10}$; after August 1st, the plaintiff is entitled to all of the flow. Defendant's maximum right of diversion for the season up to August 1st will be fixed at the rate of 2 acre feet per acre for water measured at the intake of the lower canal and $2\frac{1}{4}$ acre feet of water measured at the intake of the upper canal.